# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOSHUA BELLA,

    Plaintiff,

v.                                            Case No. 19-CV-1149

BRIAN FOSTER, *et al.*,

    Defendants.

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Joshua Bella, who is representing himself, is proceeding with the following claims: (1) defendants Brian Foster, Anthony Meli, and Jeremy Westra failed to protect him from gang members in 2019; (2) defendant Meli placed him in the same cell-block as violent inmates in "retaliation" for Bella's previous inmate complaints about failure to protect; and (3) defendant Tonia Moon denied Bella's inmate complaints about the failure to protect and retaliation. (Docket # 18 at 6.) The defendants filed a motion for summary judgment on April 15, 2020. (Docket # 37.) Bella filed a "motion for dismissal of summary judgment" on August 24, 2020.[1] (Docket # 54.) For the reasons discussed below, the court will grant the defendants' motion for summary judgment, deny Bella's "motion for dismissal of summary judgment," and dismiss this case.

---

[1] Bella's "motion for dismissal of summary judgment" appears to be a response to the defendants' motion for summary judgment. (*See* Docket # 54.) The court will therefore deny the "motion" and consider it a part of his response materials.

## RELEVANT FACTS

Bella is an inmate at the Waupun Correctional Institution ("WCI"). (Docket # 39, ¶ 2.) Defendants work at WCI: Brian Foster is a warden, Tony Meli is a security director, Jeremy Westra is a captain, and Tonia Moon is an Institution Complaint Examiner ("ICE"). (*Id.*, ¶ 1.)

Bella has a rare genetic disorder called Ehlers Danlos Syndrome ("EDS"). (Docket # 53, ¶ 9.) He walks with a cane, has seven custom braces for different body parts, and struggles with basic tasks such as getting dressed, making the bed, and cleaning. (*Id.*) Bella is in the late stages of the disorder, so he is extremely weak and cannot physically defend himself. (*Id.*)

On May 28, 2019, Bella was released from the Restrictive Housing Unit ("RHU"). (*Id.*, ¶ 1.) Upon his release, Bella was placed on the North Cell Hall. (Docket # 39, ¶ 12.) According to Bella, his cellmate on the North Cell Hall was a "known violent, mentally unstable gang member with a long history of robbing, assaulting, extorting and damaging cellys property" (Docket # 53, ¶ 1.) Bella's genetic disorder made him a prime target for extortion by this cellmate and his gang. (*Id.*, ¶ 9.)

Bella states that this cellmate started threatening him almost immediately upon his arrival on North Cell Hall. (*Id.*, ¶ 1.) The day he arrived at his cell, the cellmate took Bella's canteen purchases after threatening him and said that he would "jump" Bella and break his TV if he snitched. (*Id.*) In the days that followed, the threats and attacks continued. (*Id.*, ¶¶ 2–5.)

On June 3, 2019, the cellmate choked Bella and punched him repeatedly in the head and stomach because Bella's family refused to purchase technology items (such as headphones and tablets) for the cellmate and his gang members. (*Id.*, ¶ 2.) On June 4, 2019,

2

the cellmate choked and punched Bella in the neck for refusing to acquire pain medication from health services. (*Id.*, ¶ 3.) On June 7, 2019, the cellmate punched and kicked Bella in the ribs when he refused to hand over his canteen purchases. (*Id.*, ¶ 4.) On June 12, 2019, the cellmate attacked Bella on and off for hours. (*Id.*, ¶ 5.) Bella states that the June 12 attack "was the worst assault" to date. (*Id.*) He had bruises, scrapes, and lumps all over his face that staff could not openly ignore. (*Id.*)

In response to the June 12 attack, Lieutenant Dingman (not a defendant) moved Bella to South Cell Hall. (Docket # 39, ¶ 13.) According to Bella, South Cell Hall is "the most violent cell hall in WCI." (Docket # 53, ¶ 6.) Bella states, "this gang controls 3 out of the 4 units in WCI, so I would never be safe." (*Id.*, ¶ 7.) Bella states that the only cell hall where he is safe is South West Cell Hall, which has a "red tag for single cell." (Docket # 17 at 5.)

Upon arriving at South Cell Hall, Captain Rymarkowitz (not a defendant) told Bella that he would be placed back in RHU if he was attacked again. (Docket # 53, ¶ 6; *see also* Docket # 56, ¶ 50.) Since then, members of the same gang have continuously been extorting Bella. (Docket # 53, ¶ 6; *see also* Docket # 56, ¶¶ 6–8, 50.) Bella states that he does not want to go back to RHU, so he has been acquiescing to their demands. (*Id.*) The gang members have taken his watch, headphones, gloves, and $70. (*Id.*)

Bella claims that, in 2019, he routinely sent Foster, Meli, and Westra "highly detailed" letters and correspondences notifying them about his issue with this gang, but they did "nothing" to help him. (Docket # 53, ¶¶ 7–8; *see also* Docket # 56, ¶¶ 13, 16,19, 21–22, 24–25, 27–31, 36, 49.) Bella states that Meli "responded twice" to his letters but told him that there was nothing he could do to help Bella unless Bella provided specific details about the perceived threat. (Docket # 56, ¶ 28.)

3

The defendants explain that Bella has never identified any specific, existing, threat to his safety, either before or after the June 12 attack. (Docket # 39, ¶¶ 14–15.) An inmate requesting a Special Protection Need ("SPN") must fill out DOC-1803 and provide specific information such as names, dates, and details of the perceived threats of violence so it can be properly investigated. (*Id.*, ¶¶ 5–6.) They explain that inmates cannot be protected from an "unknown" threat. (*Id.*)

The defendants also explain that it is important to verify an inmate's allegations because it may not be the whole story. (*Id.*, ¶ 8.) According to the defendants, inmates often make false claims to obtain more favorable housing, and the Department of Corrections does not have the resources or space to accommodate all housing requests from inmates when there is not an identified or verified need. (*Id.*, ¶¶ 8–9.) The defendants state that Bella's letters and correspondences from 2019 generally referred to "gang members" but did not identify specific individuals by name, cell number, or physical description, so his allegations were insufficient to support a separation request. (*Id.*, ¶ 6.)

Bella admits that he has never given the defendants any specific names, cell numbers, or physical descriptions of the gang members because "it is very dangerous for [him] to speak to staff." (Docket # 53, ¶ 7; *see also* Docket # 52, ¶ 6.) He states, "inmates find out right away when someone talks to staff." (Docket # 53, ¶ 7.) He explains, "I was scared to give names because of security history of failing to help and the gangs being aloud [sic] to openly run their drugs, gambling, and extortion crew through ¾ of the prison." (*Id.*, ¶ 6.)

Bella states that he filed five inmate complaints and appeals about the issues in this case, "which detailed what was happening to him and the one issue to be addressed." (Docket # 56, ¶¶ 38, 41–44). Bella, however, did not file any inmate complaints about his claims

4

regarding Tonia Moon. (Docket # 39, ¶¶ 19–20.) Bella admits he didn't do this because "it's pointless" given that his past inmate complaints against Moon were rejected. (Docket # 52, ¶ 20.)

In February 2020, Bella moved back to North Cell Hall and was placed in a single cell due to a medical restriction. (Docket # 53, ¶ 6.) Bella states that the move "was not for safety." (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). When considering a motion for summary judgment, the court takes evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson*, 477 U.S. at 248, 255. "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Id*. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

5

Fed. R. Civ. P. 56(c)(1)(A)–(B). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

1. *Exhaustion of Administrative Remedies*

Under the Prisoner Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and district courts have no judicial discretion to excuse an inmate's failure to exhaust when the administrative remedies are available. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016).

The Inmate Complaint Review System ("ICRS") outlines the procedures to exhaust administrative remedies through Wisconsin's prison system. Wis. Admin. Code § DOC 310. The inmate must file an offender complaint with ICE within fourteen calendar days of the event giving rise to the complaint. § DOC 310.09(6). The inmate must then pursue "all administrative remedies that the department of corrections has promulgated by rule." Wis. Admin. Code § DOC 310.05. This means that the inmate must appeal all the way to the Office of the Secretary of the Department of Corrections, who makes the final decision. § DOC 310.14(3).

The defendants attach a copy of Bella's Inmate Complaint History Report, which shows that he did not file any inmate complaints about Moon regarding the claim against her

in this lawsuit. (*See* Docket # 41-1 at 2–3.) Bella does not dispute this. He admits that he believed it was "pointless" to file an inmate complaint against her because his past inmate complaints against her were "rejected." (*See* Docket # 52, ¶ 20.) Under the PLRA, there is no futility exception to exhaustion of administrative remedies. *Dole v. Chandler*, 438 F.3d 804, 808–09 (7th Cir. 2006) ("Exhaustion is necessary even if . . . the prisoner believes that exhaustion is futile."). Therefore, Bella failed to exhaust administrative remedies as to Moon and she is entitled to summary judgment.

   2. *Eighth Amendment—Failure to Protect*

To survive summary judgment on a failure-to-protect claim, Bella must produce evidence from which a reasonable jury could conclude that: (1) he faced a substantial risk of serious imminent harm; and (2) the defendants responded with deliberate indifference. *Harris v. Molinero*, 803 F. App'x 1, 4 (7th Cir. 2020) (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). This requires that the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Gevas v. McLaughlin,* 798 F.3d 475, 480 (7th Cir. 2015). The requisite knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citing *Farmer*, 511 U.S. at 842.) But complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger. *Id.* at 480–81.

Foster, Meli, and Westra assert that they are entitled to summary judgment on the failure to protect claim because they did not have actual knowledge of any specific risk of

harm to Bella. They argue that Bella never identified any specific, existing threat to his health or safety, either before or after the June 12 attack, and that his perceived threats of harm were vague and generalized. Bella does not dispute this. To the contrary, he admits that he never gave the defendants any specific names, cell numbers, or physical descriptions of the gang members because he perceived it as being "too dangerous" to talk to staff.

Instead, Bella asks the court to conclude that the defendants "knew" about the risk to his safety because of the number of letters and correspondences that he sent to each defendant. He states that he wrote to Foster three times, to Meli six times, and to Westra eight times. But the number of letters and correspondences Bella sent to the defendants in 2019 does not change the fact the substance of the documents were vague and generalized and did not give the defendants the information they needed to protect him.[2] According to Bella's own declaration, Meli twice advised him of the needed relevant information. But Bella nevertheless continued to make generalized and vague allegations about a threat to his safety.

Bella also tries to portray the risk of harm he faced as "obvious" given his medical condition. But there are many vulnerable inmates in prison, and the DOC cannot accommodate every housing request. This is precisely why prison officials need specific information about a threat to determine appropriate placement. Bella statement that "this gang controls 3 out of 4 units at WCI" emphasizes the defendants' point. Without specific

---

[2] The Court reviewed the 70 pages of exhibits that Bella submitted. (*See* Docket # 53-1.) The Court only found one document, filed in May 2019, that contained specific names about who was threatening him. (*See id*. at 18.) This document states that the identified individuals had threatened him "several years ago," so it still did not give the defendants the information they needed to protect him in 2019. The remainder of the documents only refer to threats from "gang members," "friends," "other inmates," "neighbors," and numerous past "cellys/cellies" (for example, he states "I have been robbed by 4 cellies.")

information on who is threatening Bella, the defendants' attempts to move him to a different wing or cell would be futile as the gang members are allegedly everywhere.

I note that when Bella was actually attacked in June 2019, he was moved immediately (that very same day) to a new cell block. Since then, he has not been attacked. Though Bella claims that he is still being extorted, he still has not come forth with any specific information about who is extorting him. Based on this record, no reasonable jury could conclude that Foster, Meli, and Westra were subjectively aware of a substantial risk of serious harm to Bella's health or safety and were deliberately indifferent towards that risk. Foster, Meli, and Westra are therefore entitled to summary judgment on the failure to protect claim.[3]

   3.   *First Amendment Retaliation*

To survive summary judgment on a retaliation claim, Bella must provide "enough evidence to allow a reasonable jury to conclude that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter future protected activity; and (3) his protected activity at least partially motivated the deprivation suffered." *Streckenbach v. Meisner*, 768 F. App'x 565, 569 (7th Cir. 2019) (citing *Walker v. Groot*, 867 F.3d 799, 803 (7th Cir. 2017)).

Meli asserts that he is entitled to summary judgment on the retaliation claim because he does not make housing assignments at WCI, and therefore, he could not have assigned Bella to South Cell Hall for the purpose of "retaliation." (Docket # 42.) To that end, the record shows that Lieutenant Dingman was the individual who made the decision to move Bella to South Cell Hall in June 2019. Bella does not have any evidence to dispute this. He

---

[3] Bella also alleges that he submitted an SPN request in December 2019 but that Westra "did not respond." (*See* Docket # 56, ¶35.) This lawsuit only involves events that happened before November 1, 2019, so the court will not address this claim.

does not even *attempt* to address the retaliation claim in his summary judgment opposition brief. (*See* Docket # 51.) His conclusory allegations from the amended complaint—that Meli placed him in a dangerous cell block to "retaliate" against him—is insufficient to create a dispute of fact sufficient to survive summary judgment. Thus, Meli is also entitled to summary judgment on the First Amendment retaliation claim and the Court will dismiss this case.

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket # 37) is **GRANTED**; the plaintiff's "motion for dismissal of summary judgment" (Docket # 54) is **DENIED;** and this case is **DISMISSED**. The clerk of court shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry

of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 17th day of February, 2021.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge